[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14201
_____

D.C. Docket No. 6:13-cv-00224-GAP-GJK

ELVAN MOORE,

Plaintiff-Appellant,

versus

KEVIN PEDERSON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 15, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and PROCTOR,[*] District Judge.[1]

ROSENBAUM, Circuit Judge:

Dorothy may have said it best when she said, "There is no place like home."[2] Though we are pretty sure that she was not talking about the Fourth Amendment, she may as well have been. Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion. The government may not enter a person's home to effect a warrantless arrest without probable cause and either consent or exigent circumstances.

But here, that is exactly what happened. Defendant-Appellee Deputy Kevin Pederson claimed to be conducting a *Terry* stop[3] of Plaintiff-Appellant Elvan Moore while Moore was in his home. When Moore would not identify himself, Pederson concluded that he had probable cause to believe that Moore had violated the law by resisting an officer. In Pederson's view, exigent circumstances also existed and Moore implicitly consented to Pederson's arrest of him while Moore was still in his home. So Pederson reached into Moore's home, handcuffed Moore,

---

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] We vacate the opinion previously issued in this case, ___ F.3d ___, 2015 WL 5438845 (11th Cir. Sept. 16, 2015), and replace it with this one.

[2] L. Frank Baum, *The Wonderful Wizard of Oz* 46, http://ir.nmu.org.ua/bitstream/handle/123456789/123102/cb6151959dc6ecf6e71dc17715e88d24.pdf?sequence=1. A copy of this webpage is available on file in this case with the Clerk's Office.

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

and arrested him.    In fact, though, Pederson lacked probable cause, the circumstances were not exigent, and Moore did not implicitly consent to Pederson's entry into Moore's home to arrest Moore.

Nevertheless, at the time of the arrest, the law was not clearly established in this Circuit that a *Terry* stop could not be conducted inside the home in the absence of exigent circumstances.  Nor was the law clearly established that a person in his own home who simply follows an officer's instructions from outside the home to turn around and present hands for cuffing does not "surrender" and therefore consent to entry for the purposes of arrest.  For these reasons, we hold today that, in the absence of exigent circumstances,[4] the government may not conduct the equivalent of a *Terry* stop inside a person's home.  We further hold that a person does not consent to entry into his home by an officer outside simply by following an officer's instructions to turn around and be handcuffed, while the person remains inside his home.

But because the law on these points was not clearly established in this Circuit before our decision today, we affirm the district court's entry of summary judgment on qualified-immunity grounds to Pederson.  We also affirm the district

---

[4] We find that this case does not involve exigent circumstances, so we do not explore today what particular exigent circumstances may justify an officer's entry into a home without a warrant and may permit the officer to conduct what is effectively a *Terry* stop inside the home.

court's dismissal of Moore's state-law claim for intentional infliction of emotional distress.

## I.

In the early morning hours of November 15, 2008, Defendant Seminole County Sheriff's Deputy Kevin Pederson was working road patrol. He received a dispatch from the Sheriff's Office in response to a call from someone at the Colonial Grand apartments. The complainant reported that a male and two females were outside, yelling at one another, though the complainant added that the dispute did "not sound violent."

At approximately 4:45 a.m., Pederson arrived at the apartment complex. When Pederson got there, the caller met him and explained that a man and two women had been arguing in the parking lot and that one of the women had left in a white vehicle. According to the caller, verbal disputes involving these people were "an everyday occurrence." The caller then directed Pederson to Plaintiff Elvan Moore's apartment as the unit into which the couple retreated.

Based on this information, Pederson approached Moore's residence to further investigate the situation. As he neared the door, he heard what he described sounded like an argument, though he could not make out any words. In addition, Pederson stated that he heard music coming from the apartment.

Pederson knocked on Moore's door.  When Moore opened the door, he was wearing a towel wrapped at the waist, and two women were visible inside the apartment—one naked and one clothed.   Though neither woman asked for assistance or otherwise indicated she was in distress, Pederson stated that he thought that one of the women "had a scowl on her face" and "appeared visibly upset, pissed off," but he could not discern at whom she was mad.   From Pederson's "initial impression," he thought "maybe this is a girlfriend that just walked in on a boyfriend who is with another woman."

Pederson began interviewing Moore in order to investigate Moore's involvement in the parking-lot disturbance.  In addition, Pederson explained, he did not know whether "a domestic violence situation" existed, based on what he had seen.

In response to the questioning, Moore expressed lack of knowledge that a parking-lot disturbance had occurred, and when Pederson requested that Moore provide his name and identification, Moore declined.   Moore also refused subsequent requests from Pederson to identify himself.

At some point during the conversation and after Moore's multiple refusals to provide identification, Pederson took out his handcuffs and instructed Moore to turn around and put his hands behind his back.  Moore did so.  At the time, Moore

was standing inside the doorway of his apartment.[5]   So Pederson reached into Moore's residence, handcuffed Moore, and arrested him.   Pederson then led Moore, who was still wearing a towel when he was handcuffed, from the doorway of his apartment to the patrol vehicle.

During the walk to the patrol vehicle, Moore's towel fell off.[6]   After placing Moore in the patrol vehicle, Pederson took Moore to the police station where he was booked and eventually provided a jump suit to wear.   Moore was subsequently charged with violating Florida Criminal Statute 843.02: resisting officer – obstructing without violence.   The charges against Moore were eventually dropped.

## II.

Following these events, Moore filed an amended complaint asserting claims for, among other things, unlawful arrest in violation of 42 U.S.C. § 1983 ("§ 1983") and intentional infliction of emotional distress (under Florida law).[7]

---

[5] Pederson attested that the arrest and handcuffing occurred outside of Moore's apartment.  Since we are reviewing the entry of summary judgment against Moore, however, we accept for purposes of our analysis Moore's version of the facts where a conflict between Moore's and Pederson's stories exists.

[6] Again, the parties' versions of the facts diverge here.  Pederson asserted that Moore wore a towel that remained on throughout the entire period that he was in Pederson's custody.  And, in fact, records reflect that Moore had a towel with him when he arrived at the station.  We nevertheless accept Moore's version of the facts in determining whether the district court correctly granted summary judgment to Pederson.

[7] Besides these claims, Moore's amended complaint alleged state-law claims for false arrest and  malicious prosecution against Pederson and also asserted claims of invasion of privacy and failure to train and supervise in violation of 42 U.S.C. § 1983 against several other

According to the amended complaint, Moore claimed that he was unlawfully arrested without probable cause based only on his refusal of Pederson's request to provide biographical information for a report.

Pederson filed a motion for summary judgment on all claims, and Moore filed a cross-motion for summary judgment on his § 1983 claim. The district court granted summary judgment in favor of Pederson on all claims. We now affirm.

## III.

We review *de novo* the district court's disposition of a summary-judgment motion based on qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Summary judgment should be entered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we consider the record

---

entities. The district court dismissed all of these claims. On appeal, without identifying any issues relating to these claims in his statement of issues and without making any actual arguments about these claims in his appellate brief, Moore attempts to incorporate by reference his arguments regarding these other state claims contained in his brief in opposition to Pederson's motion for summary judgment filed in the district court, explaining that he does so "[i]n the interest of page limits compliance." We have explained many times that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Good reasons for this rule exist. Among others, Moore's brief opposing summary judgment before the district court does not explain what defects Moore perceives in the district court's ruling, which was obviously entered after Moore filed the brief that he asks us to consider. So we (and Pederson) would have to divine what in particular Moore thought was problematic about the district court's decision. That is not how our adversarial system works. We further note that nothing prevented Moore from requesting permission to exceed the page limit if he had good cause to do so, but Moore never made such a request. Because Moore has not briefed any issues regarding these other state-court claims, any issues relating to them are deemed abandoned.

and draw all reasonable inferences in the light most favorable to the non-moving party. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam); *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012).

## IV.

The qualified-immunity defense balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Qualified immunity exists "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003).

In pursuit of that aim, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (quotation marks, and brackets omitted). Under its strictures, the doctrine shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability

and the other burdens of litigation, including discovery." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). This safeguard, however, does not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Id*. (internal quotation marks & alteration omitted).

Qualified immunity requires a public official to show first that he was acting within the scope of his or her discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). We have said that the term "discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, there is no question that Pederson satisfied this requirement, as Pederson engaged in all of the challenged actions while conducting investigative and arrest functions as a deputy sheriff and while on duty.[8]

---

[8] Although Moore argues in his opening brief on appeal that Pederson was not acting within the scope of his duties, Moore did not raise this challenge in response to Pederson's motion for summary judgment in front of the district court. Consequently, Moore forfeited this argument. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) ("[A]bsent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal."). And even if he had not forfeited the argument, we find that it lacks merit.

Because Pederson has established that he was acting within the scope of his discretionary authority, the burden shifts to Moore to demonstrate that qualified immunity is inappropriate. *See id.* Moore must show that, when viewed in the light most favorable to him, the facts demonstrate that Pederson violated Moore's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Pederson's actions. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223, 129 S. Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, Moore must satisfy both showings. *Maddox*, 727 F.3d at 1120-21 (citation omitted).

## A.

We start by considering whether Pederson transgressed any of Moore's constitutional rights. We find that he did. In particular, Pederson violated Moore's right to be free from unreasonable seizures.

## 1.

Stemming from the origins of our nation, the home has always been viewed as a sacrosanct place with unique rules that apply to it. *See Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980) ("The zealous and frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both in

England[] and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty").  Indeed, the Framers considered the hallowed stature of the home to be so important that they directed two amendments in the Bill of Rights at it, protecting the privacy of the home with both the Fourth Amendment and the Third Amendment.[9]

With respect to the Fourth Amendment, the Supreme Court has opined that the "physical entry of the home is the chief evil against which the wording of [that provision] is directed."  *United States v. U.S. Dist. Ct. for E.D. Mich., S. Div.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134 (1972).  Looking to the language of the Fourth Amendment, it is easy to understand the Supreme Court's reasoning.  The Fourth Amendment strictly commands, "The right of the people to be secure in their persons [and] houses . . . against unreasonable . . . seizures, shall not be violated . . . ."  U.S. CONST. amend IV.  Under it, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons . . . to be seized."  *Id.*

As the Supreme Court has explained, the Fourth Amendment "draw[s] a firm line at the entrance to the house."  *Payton*, 445 U.S. at 590, 100 S. Ct. at 1382.  As a result, "warrantless arrest in a home violates the Fourth Amendment unless

---

[9] The Third Amendment, which is not at issue in this case, provides, "No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law."  U.S. CONST. amend. III.

the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant." *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1328 (11th Cir. 2006). But make no mistake: in the absence of these stringent circumstances, for the purpose of arresting a person without a warrant, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much . . . ."[10] *Kyllo v. United States*, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045 (2001) (citation omitted).

Applying these rules, in *McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007), we held that an officer who, without a warrant, or probable cause along with exigent circumstances or consent, "reached into [a] house, grabbed [the plaintiff], and forcibly pulled him out onto the porch" in order to arrest him, violated the plaintiff's Fourth Amendment rights.

## 2.

Moore's case is not materially different. Like the officer in *McClish*, Pederson did not have a warrant, and he lacked probable cause, exigent circumstances, and consent. He nonetheless breached Moore's home's threshold for the purpose of arresting Moore when he handcuffed Moore, who was standing

---

[10] If we were speaking in terms of football, we might say that it is a Fourth Amendment violation if any part of the law-enforcement officer breaks the plane of the home to conduct a warrantless arrest without probable cause and either consent or exigent circumstances. *See 2015 NFL Rulebook*, Rule 3, § 39, http://operations.nfl.com/the-rules/2015-nfl-rulebook/ ("It is a Touchdown if any part of the ball is ***on, above, or behind the opponent's goal line*** while legally in possession of an inbounds player, provided it is not a touchback.") (emphasis added).

inside his apartment's doorway at the time. As a result, Pederson violated Moore's Fourth Amendment right to be free from unreasonable seizures.

While Pederson contends that he had probable cause to arrest Moore for his alleged violation of Fla. Stat. § 843.02, which makes it illegal to resist an officer without violence, serious problems doom Pederson's argument. To begin with, Pederson's position necessarily depends on the conclusion that Moore refused to provide his identification to Pederson during a lawful *Terry* stop, but Pederson did not conduct a lawful *Terry* stop.

In *Terry v. Ohio*, the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000) (citing *Terry*, 392 U.S. at 30, 88 S. Ct. at 1868). A *Terry* stop is a type of seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove himself from the situation. *Terry*, 392 U.S. at 16, 88 S. Ct. at 1877. The standard of "reasonable suspicion" that is required to justify a *Terry* stop is significantly more lenient than that of "probable cause," which is necessary to support a warrant. *Id.* at 123, 120 S. Ct. at 675-76.

Pederson asserts that, when he initially approached Moore's door, he had reasonable, articulable suspicion of a breach of the peace, based on the

complainant's report about the parking-lot dispute and the music and argument emanating from inside Moore's apartment.  For purposes of our discussion, we will assume that he is correct.[11]  Pederson bolsters his reasonable-suspicion argument by relying on his assessment of the situation after Moore opened the door— namely, that he had reasonable, articulable suspicion that a possible ongoing domestic dispute related to the parking-lot incident could have been occurring. These circumstances, Pederson suggests, independently allowed him to continue his *Terry* stop.

But significantly, the circumstances in this case did not satisfy the definition of "exigent circumstances" either before or after Pederson's interaction with Moore.  Before Pederson knocked on Moore's door, all he knew was that a neighbor had complained of a non-violent argument in the parking lot where one of

---

[11]  Even if he is not, Pederson could have lawfully knocked on Moore's front door seeking to ask him questions outside the context of a *Terry* stop.  *Morris v. Town of Lexington, Ala.*, 748 F.3d 1316, 1324 (11th Cir. 2014) (citing *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1416 (2013).  As we have explained, "officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may."  *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (alteration, internal quotation marks, and citation omitted).  But an important difference exists between a *Terry* stop and the type of interaction that occurs when a person responds to an officer's knock on the door and engages in conversation with that officer: the mandatory versus the voluntary nature of the interaction.  In the *Terry* stop, the person is detained within the meaning of the Fourth Amendment; he cannot simply walk away or otherwise avoid the encounter.  But when a citizen is not detained by a *Terry* stop or otherwise lawfully detained and chooses to speak with an officer, that citizen has the right to cease answering questions and walk away from the officer; the encounter is entirely voluntary.  When this type of interaction occurs as the result of a citizen's decision to speak with officers after they knock on the door of his home, provided that no warrant or probable cause and exigent circumstances exist, the citizen has the right to terminate his voluntary participation in the conversation by retiring into his home and closing the door.

the participants had left the scene, and Pederson heard what he believed could have been arguing and music coming from inside the apartment. These facts are a far cry from an "emergency situation[] involving endangerment to life" that we have previously described as constituting exigent circumstances. *See, e.g.*, *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002).

And after Moore opened the door for Pederson, nothing that Pederson reported observing established or even suggested that anyone's life or health was at risk. At worst, Pederson saw a naked man, a naked woman, and a clothed woman with a scowl on her face. No one appeared injured in any way; Pederson did not report seeing any furniture or other items strewn about; and Pederson did not identify any behavior or conduct that suggested that any of the occupants of the residence contemplated violence in any way. Moreover, while the complainant reported hearing arguments from that apartment on other occasions, which he considered a nuisance, he specifically described the disputes as "verbal" and non-violent. This is not the stuff of which life- or limb-threatening emergencies that constitute "exigent circumstances" are made.

As a result, Pederson could not have lawfully executed a *Terry* stop in this case. Because Pederson did not have a warrant and he was not conducting a lawful *Terry* stop when Moore was inside his home, Moore was free to decide not to answer Pederson's questions. *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849,

- 15 -

1862 (2011) ("When the police knock on a door . . . [and the] occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."). Consequently, Moore's refusal to answer Pederson's requests for identification could not have served as the basis for a violation of Fla. Stat. § 843.02, resisting an officer without violence, and Pederson lacked probable cause to arrest Moore for this violation.

Not only were probable cause and exigent circumstances lacking, but Moore also did not consent to Pederson's entry for the purpose of arresting him. To assert that Moore did consent, Pederson relies on *dicta* in *McClish*, 483 F.3d 1231, 1240-41 (11th Cir. 2007). In *McClish*, the defendant officers decided that they had probable cause to arrest McClish for aggravated stalking. *Id.* at 1234. Though they had no warrant and they conceded that they lacked exigent circumstances, the officers went to McClish's home to arrest him. *Id.* at 1234-35. In response to the officers' knock, McClish opened his front door. *Id.* at 1235. One of the officers immediately reached into McClish's home, grabbed McClish, pulled him out of his home, and arrested him. *Id.* at 1235-36. We held that the officers violated McClish's Fourth Amendment right to be free from unreasonable seizures when they entered McClish's home for the purpose of arresting him without a warrant, exigent circumstances, or consent. *Id.* at 1248.

In the course of noting that the record contained no evidence that McClish had consented to entry for the purposes of arrest, we explained, "[W]e have held that 'whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction *entry* into the home based upon inferred consent.'" *Id.* at 1241 (citations omitted). We then clarified, "This is not to say, of course, that a suspect may not **_surrender_** to the police—'there is nothing in *Payton* that prohibits a person from **_surrendering_** to police at his doorway.'" *McClish*, 483 F.3d at 1241 (emphasis added) (citing *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991)).

Pederson latches onto this language in *McClish* and our citation to *Berkowitz* to argue that Moore "surrendered" to Pederson when Moore turned around and put his hands behind his back, so Pederson was free to enter Moore's home to effect the arrest. We disagree.

This case does not involve any affirmative act evidencing free and voluntary consent to Pederson's entry into the home. Instead, Moore simply followed the commands of an armed law-enforcement officer who was standing face to face with Moore and had just advised Moore that he was going to handcuff and arrest him. But Pederson cannot establish that Moore freely and voluntarily consented by "showing a mere submission to a claim of lawful authority." *See Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983). A person should not have to risk

the possible use of force against him in an officer's mistaken effort to obtain the intended arrestee's compliance with the officer's commands. And we do not wish to contribute to the already-daunting level of danger that law enforcement must face by encouraging people to disobey what they may perceive as lawful police orders. We therefore hold that Moore did not consent to Pederson's entry into Moore's home for the purpose of arresting Moore when Moore turned around and presented his hands to Pederson in response to Pederson's commands to Moore to do just that.

We have said that an officer may not enter the home for the purpose of effecting a warrantless arrest unless that officer has both probable cause and either exigent circumstances or consent. *Bashir*, 445 F.3d at 1328. So we cannot see how law enforcement could enter a home to detain a person on reasonable, articulable suspicion of a criminal violation (resisting an officer without violence)—a much lower standard than probable cause—when neither exigent circumstances nor consent exist. That just makes no sense to us. *See United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) ("It would defy reason to hold . . . that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.").

In the absence of probable cause and without a warrant, Pederson could not have lawfully entered Moore's premises for the purpose of arresting him. Because Pederson reached into Moore's home to arrest him, anyway, Pederson violated Moore's constitutional right to be free from unreasonable seizure.

## VI.

Having determined that Pederson violated Moore's Fourth Amendment right to be free from unreasonable seizure, we consider whether, as of November 15, 2008, when Pederson arrested Moore, the parameters of that right as it arose in this case were clearly established. We find that they were not.

The touchstone of qualified immunity is notice. *Holmes*, 321 F.3d at 1078. The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

Our Circuit uses two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). The first requires the court to examine whether "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) [have] clearly establish[ed] the law." *McClish*, 483 F.3d at 1237 (citation omitted). This method does not require

"[e]xact factual identity with a previously decided case" but rather demands that "the unlawfulness of the conduct must be apparent from the pre-existing law." *Coffin*, 642 F.3d at 1013 (citations omitted).

The second approach asks whether the officer's "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law" on point. *Fils*, 647 F.3d at 1291 (alteration in original) (citation and quotation marks omitted). Even in the absence of caselaw holding the specific conduct unlawful, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Coffin*, 642 F.3d at 1014-15; *see Fils*, 647 F.3d at 1291. But this principle, which offers a narrow exception to the general rule that only factually specific analogous caselaw can clearly establish a constitutional violation, is reserved for rare cases. *Coffin*, 642 F.3d at 1015.

## A. The Initial *Terry*-like Stop

Moore does not point to a particular Supreme Court, valid Eleventh Circuit, or Florida Supreme Court case that he contends clearly established that *Terry*-like stops may not be conducted in the home. Instead, he asserts that it was clearly established that a *Terry* stop could not occur inside the home because all cases approving of *Terry* stops involve temporary detentions in public places, not in

homes.  In further support of his argument, Moore points to a vacated Eleventh Circuit case and cases outside this Circuit where courts have opined that a *Terry* stop cannot occur in the home.  We disagree that Moore has demonstrated that the law was clearly established in this case as of November 15, 2008, that an officer may not conduct a *Terry*-like stop in the home in the absence of exigent circumstances.

First, the mere dearth of binding caselaw holding that a particular activity is constitutional cannot, in and of itself, clearly establish that that activity is unconstitutional or otherwise impermissible.  Indeed, that Moore discovered no valid, binding caselaw that holds that a *Terry*-like stop *can* be conducted in a home does not somehow clearly establish the principle that a *Terry*-like stop *cannot* be executed in a home.

Nor does Moore find the necessary support in the cases he cites.  Moore relies on a vacated Eleventh Circuit case, two Ninth Circuit cases that were issued after November 15, 2008, and a Tenth Circuit case that was issued in May 2008.  To state the obvious, *United States v. Tobin*, 890 F.2d 319, 327 (11th Cir. 1989), *vacated*, 902 F.2d 821 (11th Cir. 1990), the Eleventh Circuit case on which Moore relies, was vacated.  That means it has no legal force, so it could not have clearly established the law.

While Moore acknowledges as much, he suggests that the Eleventh Circuit's subsequent *en banc* opinion in *Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (en banc) ("*Tobin II*"), clearly established that an in-home *Terry*-like stop violates the Fourth Amendment when it stated that "reasonable suspicion cannot justify the warrantless search of a house." Not only does the quotation that Moore cites address warrantless searches, not *Terry*-like stops, but review of the entire quotation—"Reasonable suspicion cannot justify the warrantless search of a house, ***but it can justify the agents' approaching the house to question the occupants***," 923 F.3d at 1511 (emphasis added) (citation omitted)—does not "dictate[], that is, truly compel[], the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiff['s] federal rights in the circumstances." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc) (citation and internal quotation marks omitted).

In fact, a panel of this Court, relying on the same quotation about "warrantless search[es]" in *Tobin II* on which Moore hangs his hat, said only that "[w]e are skeptical that 'reasonable suspicion' is the correct standard for justifying the officers' entry" into the home. *Morris*, 748 F.3d at 1323 n.17. If, as recently as last year, a panel of this Court was, at worst, "skeptical" that *Terry*-like stops could occur in the home, we cannot say that the law on that point was "clearly established" for officers six-and-one-half years ago. For this reason, Moore's

argument must fail, regardless of the caselaw from other jurisdictions.[12]  And we cannot conclude that in November 2008 the law was clearly established in this Circuit that a *Terry*-like stop cannot be conducted in the home, in the absence of exigent circumstances.  As a result, the district court correctly found that Pederson was protected by qualified immunity with respect to the initial *Terry*-like stop.

## B.  The Arrest

We reach the same conclusion regarding the warrantless arrest.  It is true that as of November 15, 2008, when the incident in this case occurred, the law was clearly established in this Circuit that an officer may not conduct a warrantless arrest without both probable cause and either exigent circumstances or consent.  *See Bashir*, 445 F.3d at 1328.  And here, Pederson had no warrant, and he similarly lacked exigent circumstances and consent.

---

[12]  As for the cases from other jurisdictions, first, in and of themselves, they cannot clearly establish the law in this Circuit.  *See McClish*, 483 F.3d at 1237.  Second, the Ninth Circuit cases that Moore cites—*United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010), and *United States v. Perea-Rey*, 680 F.3d 1179, 1185-86 (9th Cir. 2012)—both postdate the events in this case, so they could not have put Pederson on notice that *Terry*-like stops cannot occur in the home even outside this Circuit.  And finally, as of the time of the events in this case, at least one circuit had applied a *Terry* analysis to an investigatory stop of people in their hotel room, suggesting that if sufficient facts to establish reasonable suspicion exist, a *Terry*-like stop may be conducted in the home.  *See United States v. Jerez*, 108 F.3d 684, 693-94 (7th Cir. 1997).  This means that in the absence of caselaw on this point from the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, at best, disagreement among other circuits existed as to whether a *Terry*-like stop could be conducted in the home.  "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."  *McClish*, 483 F.3d at 1249 (citation and internal quotation marks omitted).

But, as discussed above, none of the cases that stand for the principle that a warrantless arrest may not be conducted in the home without both probable cause and either exigent circumstances or consent involved a *Terry* stop.

When an officer lawfully conducts a *Terry* stop, Fla. Stat. § 843.02 authorizes the officer to arrest a person who refuses to provide identification in response to requests. *See M.M. v. State*, 51 So. 3d 614, 616 (Fla. Dist. Ct. App. 2011). Neither exigent circumstances nor probable cause is necessary. So Pederson suggests that, had he been correct in thinking that he could execute a valid *Terry* stop in the home, he would not have needed either exigent circumstances or consent to effect the arrest of Moore, even though he had to reach into Moore's home. Pederson further relies on the proposition that we must evaluate whether the violated constitutional right was clearly established "in light of the specific context of the case, not as a broad general proposition." *See Saucier*, 533 U.S. at 201, 121 S. Ct. 2151.

We need not determine whether Pederson's theory on this particular issue is correct because, in any case, we cannot find that, at the time of the events in this matter, the law was clearly established with respect to the bounds of consent to enter the home for the purpose of effecting an arrest. We recognize, of course, the clearly established general proposition that consent is not freely and voluntarily

given when a person merely acquiesces to a claim of lawful authority. *See United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993).

But "[o]bvious clarity cases" are "rare." *Coffin*, 642 F.3d at 1015 (citations and quotation marks omitted). To rely on that "narrow exception," we must find that the officer's acts were "so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment." *Id.* (citations and quotation marks omitted).

Here, we cannot do that. First, while the Dissent notes that *McClish* established "the [factually specific] rule that an officer may not infer consent to reach into a home to execute an arrest," Dissent at 50, it does not acknowledge that the very next sentence of *McClish* necessarily narrowly defined until today what "infer[ring] consent" meant in this Circuit by stating that "surrender" can permissibly communicate consent to entry for purposes of effecting an arrest. Significantly, none of the caselaw that the Dissent cites or that we have been able to find considers what constitutes "surrender" in the absence of overwhelming force, for purposes of establishing consent to enter the home and execute an

arrest.[13]    So, with respect to the issue of consent, none of the cases on which the Dissent relies—including *McClish*—are factually similar to Moore's case.[14]

Second, the universe of our caselaw on the meaning of "surrender" in the context of consent to an arrest in the home appears to be limited entirely to *McClish*.  As we have noted, *McClish* specified that an officer may enter the home for the purposes of arresting a person if the person "***surrender***[s] to the police— 'there is nothing in *Payton* that prohibits a person from ***surrendering*** to police at his doorway.'"  *McClish*, 483 F.3d at 1241 (emphasis added).  This statement appears in *McClish* without further discussion than its citation to *Berkowitz*, 927 F.3d 1376.  *McClish*, 483 F.3d at 1241.  Nor can we find that the facts of *McClish*,

_____

[13] The Dissent cites *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983) and *Hidalgo*, 7 F.3d 1566, in support of the general proposition that "[s]ubmission to law enforcement commands is not consent."  Dissent at 47.  *Royer* involved a warrantless arrest in a public space (an airport), 460 U.S. at 493-94, and *Hidalgo* concerned the voluntary consent to a *search* following a lawful arrest in the home.  7 F.3d at 1571.  Neither resolves the issue here. As for *United States v. Edmondson*, 791 F.2d 1512 (11th Cir. 1986), in that case, the FBI, with weapons drawn, surrounded a home, knocked on the door, and, when the defendant looked outside and saw the assemblage, an agent yelled, "FBI.  Open the door."  *Id.* at 1514.  The defendant opened the door, stepped back, and placed his hands on his head in response.  *Id.* Unlike in *Berkowitz* and Moore's case, where the officer's weapon remained holstered and the officer simply used his voice to obtain Moore's compliance, *Edmondson* involved a clear show of overwhelming force that was used to obtain the defendant's submission.

[14] *McClish* clearly established that an officer may not execute a warrantless arrest without probable cause and either consent or exigent circumstances, even if the arrestee is standing in the doorway of his home when the officers conduct the arrest.  What it did not clearly establish was the entirely separate question of the meaning of "surrender" and therefore "consent" in the context of an in-home arrest.  Significantly, unlike Moore's case, *McClish* did not involve lawful police commands.  In *McClish*, the officers rushed into McClish's home and arrested him without giving him an opportunity to consent or surrender.  As a result, the boundaries of *McClish*'s reference to "surrender" as consent were not clear.

where the petitioner "did not surrender . . . [or] ***have the opportunity to do so***," 483 F.3d at 1241 (emphasis added), otherwise provides any guidance as to what can or does constitute "surrender" for purposes of consent.[15]

As a result, a reasonable officer might either understand the term "surrender" to carry its common meaning, as limited by the facts of cases such as *Edmondson*, 791 F.2d 1512, *see supra* at n.12, or a reasonable officer might consult *Berkowitz* for guidance on the meaning of the term. Either way, under *McClish*, a reasonable officer would not be on clear notice before today that Moore's actions did not constitute the type of "surrender" that can qualify as consent for the purpose of entering a home to effect an arrest.

With respect to the common or plain meaning of "surrender," the dictionary defines the term as follows: "[t]he act of yielding to another's power or control," *Surrender*, BLACK'S LAW DICTIONARY (10th ed. 2014), or "[t]o relinquish possession or control of to another because of demand or compulsion," *Surrender*, THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

---

[15] The Dissent's discussion about "*McClish*'s reference to 'surrendering' [not being] meaningless" necessarily demonstrates the confusion surrounding the term prior to today. *See* Dissent at 49 n.1. In this regard, the Dissent seeks to explain the term, at least in part, by suggesting that "there is no 'entry based upon inferred consent' if an arrestee surrenders by voluntarily stepping outside to submit to an arrest." *Id.* First, in such a case, there is no entry at all because the arrestee has left the home. So that leaves open the question of what constitutes "surrender" and therefore consent allowing an arresting officer to enter the home for the purpose of executing an arrest. And second, the Dissent does not explain how Pederson should have known that this was what *McClish* supposedly meant when it invoked the term "surrender" and cited *Berkowitz*.

- 27 -

Based on these definitions, before today, a reasonable officer could have understood Moore's actions in turning around and presenting his hands in response to the officer's instructions as surrender, and consequently, as consent under *McClish*.

This is so because, in conjunction with Moore's actions, nothing in the record provides evidence that Moore ever said or otherwise communicated that he did not consent to entry for the purposes of executing the arrest. Nor does any evidence indicate that Pederson physically threatened Moore or otherwise presented Moore with the type of overwhelming force that occurred in *Edmondson* in order to obtain Moore's cooperation with Pederson's instructions.

As for *Berkowitz*, that case, too, could be construed to support the notion that a person inside his home "surrenders" for arrest to an officer outside the home when he acquiesces in the officer's directions—whatever those directions happen to be—instead of simply closing the door to his home. And, in fact, Pederson devoted three pages of his brief to arguing that, under *Berkowitz*, Pederson reasonably construed Moore's actions in turning and offering his hands in response to Pederson's instructions, as consent in the form of surrender.

In *Berkowitz*, the court evaluated alternative factual scenarios. In the one relevant here, an officer knocked on the defendant arrestee's door, and the defendant opened the door. 927 F.2d at 1380. The officer immediately advised the

defendant that he was under arrest. *Id.* In explaining what happened next, the court wrote that the defendant "did not resist ***or attempt to close the door***; he simply asked if he could have his sports coat." *Id.* (emphasis added). An officer then entered the home, retrieved the coat, and arrested the defendant. *Id.*; *see also id.* at 1386. The court concluded that the arrest, including the entry into the defendant's home to effect the arrest, was "legal" because the defendant had "surrender[ed]," "acquiesced" in, and "submitted to" the officer's authority. *Id.* at 1386. In explaining its ruling, the court stated,

> When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest.

*Id.* at 1387.

In contrast to the Dissent's contention that it was clearly established in this Circuit that "an arrestee does not 'consent' when he obeys a police officer's command that he is under arrest," Dissent at 49, we think that *Berkowitz* could be read to suggest just the opposite: that "acquiescence" in and "submission to" an officer's authority instead of closing the door of one's home in response to an

officer's command that one is under arrest, can constitute surrender and therefore consent to entry into the home for purposes of effecting an arrest.

In Moore's case, Moore did not close his door in response to Pederson's announcement from outside the home that Moore was under arrest. Rather, Moore acquiesced in and submitted to Pederson's instructions that he turn around and present his hands for cuffing. Based on *Berkowitz*, we cannot say that a reasonable officer plainly should have known that Moore's conduct did not evidence "surrender."[16]

To be clear, for the reasons we have already described, we strongly reject any suggestion that a person "surrenders" and therefore "consents" to arrest in his home simply because he recognizes the officer's authority or "submit[s] to" or "acquiesce[s]" in the arresting officer's commands or because he does not close the door of his home in response to an officer's announcement that he is under arrest. Today we clearly establish as the law of this Circuit that merely following an officer's commands—without any separate affirmative act or speech demonstrating *voluntary* and *free* consent—does not constitute "surrender" and therefore consent to an officer's entry into the home to effect the arrest. Nor does failure to close the door.

---

[16] We do not suggest that this interpretation is the current law of the Seventh Circuit. Reasonable officers in the Eleventh Circuit are not charged with knowing the law in the Seventh Circuit. Therefore, Pederson's duty to know Seventh Circuit law began and ended with *Berkowitz* because of *McClish*'s citation of *Berkowitz* regarding "surrender" as consent.

But we have "emphasized that *fair and clear notice* to government officials is the cornerstone of qualified immunity."  *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Marsh v. Butler Cty.*, 268 F.3d 1014, 1031 (11th Cir. 2001) (*en banc*), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)) (emphasis added by *Vinyard* panel).  And in light of *McClish* and *Berkowitz*, we cannot say that, as of November 15, 2008, Pederson had "fair and clear notice" that a person does not "surrender" and therefore consent to entry of his home for purposes of effecting an arrest, by "acquiesc[ing]" in or "submit[ting] to" the arresting officer's announcement that he is under arrest and by turning around and presenting hands for cuffing in response to instructions to do just that (and not closing the door of his home instead).  As a result, qualified immunity shields Pederson from liability for his wrongful entry into Moore's home to arrest him.

Nor does the Dissent's concern about considering *Berkowitz* allow us to disregard the case.  The Dissent mentions *Berkowitz* only briefly.  *See* Dissent at 49 & 49 n.1.  Notably, the few mentions of *Berkowitz* do not suggest in any way that our interpretation of *Berkowitz*'s discussion of "surrender" is not a reasonable one.  Instead, the Dissent seems to advocate effectively ignoring *Berkowitz* simply because the Seventh Circuit issued it.

While we generally agree that Seventh Circuit law does not govern the question of qualified immunity in this Circuit, the problem here is that our caselaw—*McClish*—favorably cites *Berkowitz* for the proposition that surrender can constitute consent to entry of the home for purposes of arrest. At the same time, *McClish* does not elaborate any further on the meaning of "surrender" in the context of consent to enter a home to conduct an arrest. Particularly in light of the broad common meaning of "surrender," it would not have been unreasonable for an officer to have consulted *Berkowitz* for guidance on the meaning of "surrender." Under these circumstances, we will not penalize an officer for acting in accordance with his not-unreasonable understanding of a case that we ourselves have relied upon.

Finally, we note that the question before the district court (and therefore before us) on Pederson's motion for summary judgment based on qualified immunity was not, as the Dissent suggests, whether Moore, in fact, viewed himself as having consented to entry. *See* Dissent at 51-53. The question instead was whether a reasonable officer in Pederson's position could have understood Moore's words (of lack thereof) and actions, as set forth in the light most favorable to Moore, to have evidenced consent on Moore's part. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful

official action generally turns on the 'objective legal reasonableness' of the action[,] . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken.").  So Moore's legal argument in his brief that, as a matter of fact, he did not consent to entry, in and of itself, cannot create a material issue of fact regarding whether Pederson is entitled to qualified immunity on the grounds that a reasonable officer could have construed Moore's uncontested words and actions as consent to entry.[17]

Because the law was not clearly established until today that Pederson lacked probable cause to arrest Moore since he could not conduct a *Terry*-like stop in the home absent exigent circumstances, and further, because the law was not clearly established until today that Moore's actions in acquiescing to Pederson's instructions did not amount to consent to enter the home, the district court properly granted Pederson qualified immunity.

---

[17] We respectfully disagree with the Dissent that we have failed to view the facts in the light most favorable to Moore.  *See* Dissent at 51-53.  Nor does the Dissent identify a single part of the record that conflicts in any way with the facts as we have set them forth in the light most favorable to Moore.  Instead, the Dissent suggests that we have failed to meet this standard simply because Moore argued in his summary-judgment brief that he "did not consent to the interaction."  *See id.* at 52.  As we have explained above, however, the question on qualified immunity is not whether, in Moore's mind, Moore viewed himself as consenting to entry for purposes of arrest.  Nor could it be; there is no way for a reasonable officer to know what is inside the mind of another individual.  The question instead is whether a reasonable officer in Pederson's position could have understood Moore's words (or lack thereof) and actions, as set forth in the light most favorable to Moore, to have evidenced consent on Moore's part.

## VII.

Finally, we turn to the district court's entry of summary judgment for Pederson on Moore's claim for intentional infliction of emotional distress.

In Florida, to prove intentional infliction of emotional distress, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Gallogly v. Rodriguez*, 970 So. 2d 470, 471 (Fla. Dist. Ct. App. 2007). Regarding the second prong, even tortious or criminal intent, or intent to inflict emotional distress, standing alone, is not enough. *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Nor is "conduct [that] has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Instead, Florida courts have found "'[l]iability . . . only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Indeed, only those situations where "recitation of the

facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" satisfy the standard required to establish a claim of intentional infliction of emotional distress. *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Nonetheless, in situations involving government authority, courts recognize that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position" and consequently "give greater weight to the fact that the defendants had actual or apparent authority over [the plaintiff] as police officers." *Gallogly*, 970 So. 2d at 472 (quotation marks omitted).

Moore argues that Pederson "forced" Moore to be naked and refused to allow Moore to put on clothing, and he alleges that both acts constituted extreme and outrageous conduct. Under Moore's recollection of the facts, Pederson arrested Moore while Moore was wearing a towel wrapped around his waist. On the walk from Moore's front door to the police car, Moore's towel began to fall off, completely dropping by the end of the first five feet of the walk.[18] For the remaining fifteen feet, Moore was completely naked. When Moore asked two

---

[18] Pederson contended that the towel remained on Moore throughout the arrest and right up until Moore's processing. He further asserted that Moore had clothes with him in Pederson's vehicle because one of the two women brought Moore clothes to put on for when he bonded out of jail. Pederson stated that he took Moore's clothes to the jail for him. We also note that Moore's processing report shows that he was booked with a towel, meaning that under Moore's version of the facts, Pederson would have had to have stopped to pick up the towel from the ground when it fell off, or someone else would have had to have provided the towel to Pederson so that Moore could have it at the time that he was processed. For purposes of evaluating the entry of summary judgment against Moore, though, we accept Moore's version of the facts.

separate people to bring him clothes, Pederson responded by instructing them to stay where they were, or he would arrest them as well.

Upon arrival at the Sheriff's Office, Moore saw a woman approaching to process him. In response, Moore asked Pederson to please make arrangements for a man to process him since he was naked. Pederson immediately obliged, and a man processed Moore instead, bringing him a blue jumpsuit to put on.

We need not determine whether Pederson's conduct was "outrageous." Regardless of whether it was, we are compelled to affirm the district court's grant of summary judgment on Moore's claim for intentional infliction of emotional distress. Moore was required to show that he suffered "severe" emotional distress stemming from Pederson's actions. *Gallogly*, 970 So. 2d at 471. But Moore made absolutely no argument suggesting how he had done that, either in his briefing before this Court or that before the district court, nor did he point to any facts evidencing that he suffered severe emotional distress.

Accordingly, we hold that Moore has not established a claim for intentional infliction of emotional distress because he has not shown that Moore suffered "severe" emotional distress as a result of Pederson's actions.

## VIII.

Home may be where the heart is,[19] but it cannot be where the government is—at least for purposes of conducting a *Terry*-like stop, in the absence of exigent circumstances.  Today we clearly establish this as the law in this Circuit. But since the law was not clearly established on this point when Pederson engaged in the *Terry*-like stop of Moore while Moore was in his home, the district court did not err when it granted qualified immunity to Pederson on this issue.  The district court likewise did not err in granting qualified immunity to Pederson regarding his arrest of Moore while Moore was in his home.  The law was not clearly established at the time of the arrest that Moore's compliance with Pederson's demands that he turn around and present his hands for cuffing did not constitute consent.  Finally, the court did not err in determining that Moore failed to establish a claim for intentional infliction of emotional distress.  For these reasons, the district court's order is **AFFIRMED**.

---

[19] "Home is where the heart is" is a quotation often attributed to Pliny the Elder, also known as Gaius Plinius Secundus.  Tragically and perhaps ironically, Pliny the Elder died trying to save his family and his friend Pomponianus from their homes in the aftermath of Mount Vesuvius's eruption.

PROCTOR, District Judge, concurring:

Although I fully concur in Judge Rosenbaum's opinion, I write to underscore why this case involves a constitutional violation of Moore's rights, but Deputy Pederson is nevertheless entitled to qualified immunity. I also write separately to emphasize the landscape of the law on qualified immunity that must be followed when considering officer liability on these types of claims.[1]

Qualified immunity "represents the norm" for government officials exercising discretionary authority. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). Indeed, as the qualified immunity defense has evolved, it provides ample protection to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). And "[o]nce the defendant public official satisfies his burden of moving forward with the evidence [consistent with qualified immunity], the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.'" Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting Zeigler v.

---

[1] Although I join in Judge Rosenbaum's opinion, I am not sure it is necessary to decide this case on the question of "arguable consent." In my judgment, Pederson should prevail on his qualified immunity defense even before we reach that question. Nevertheless, Judge Rosenbaum has correctly analyzed the issue; her discussion of it provides additional reasons the district court's ruling is due to be affirmed.

Jackson, 716 F.2d 847, 849 (11th Cir. 1983)).  It is essential to keep this

topography in mind when considering the facts of this case.

    Let me be very clear.  I agree that Pederson could not have lawfully

executed a Terry stop in this case, at least while Moore was inside his home.

Likewise, I agree that Moore, standing inside his home, was free to decide not to

answer the Deputy's questions.[2]  Finally, I also agree that it was unlawful for

Pederson to have arrested Moore.  But that is not all this case involves.

    When Pederson knocked on Moore's door, he was responding to a complaint

of a verbal dispute in the parking lot of an apartment complex.  When he

approached Moore's door, there is nothing in the record to suggest that Pederson

had anything in mind other than to perform a "knock and talk," and tell those

creating the disturbance to keep it down.  But when the door finally opened (after a

protracted wait), the scene presented to Deputy Pederson raised his level of

concern.  He saw (literally) a half-naked man, a completely naked woman, and a

completely clothed woman who was (in Pederson's words) "pissed off" with a

scowl on her face.  He suspected a domestic situation and began to ask questions.

As the half-naked man refused to answer questions and refused to give his name,

the "knock and talk," in the Deputy's mind, morphed into a Terry stop.  Deputy

---

[2] The Supreme Court's decision in Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1862 (2011) makes this clear.  But the Court did not decide that case until 2011, three years after the events in this case.

Pederson then arrested Moore through the threshold of the doorway for Moore's failure to cooperate.  Importantly, there is a Florida criminal statute which states that "[w]hoever shall resist, obstruct, or oppose any officer … without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor in the first degree.…"  Florida Statute § 843.02.

On this unique set of facts, the primary question for us to consider is whether a reasonable officer would understand that reaching across the threshold to arrest Moore in the course of what Pederson erroneously believed to be a Terry stop violated a clearly established constitutional right.  Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011); see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (holding that to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did). No decision of the United States Supreme Court, this court, or the Supreme Court of Florida had clearly established the law on this issue in 2008.  In fact, in 2014 a panel of this Circuit stated it was "skeptical" that the reasonable suspicion standard advanced in Terry could properly be the standard for justifying a warrantless arrest through the doorway of a home.  Morris v. Town of Lexington, 748 F.3d 1316, 1323, n. 16, 17 (11th Cir. 2014).[3]  If, in 2014, a panel of this Circuit was only

_____

[3] Nor does the Morris decision undermine Pederson's qualified immunity defense.  It was decided in 2014, after the events of this case, and is also factually dissimilar to what occurred here.

skeptical about the argument Pederson advances here, it follows tautologically that the law could not have been clearly established in 2008 when Pederson stood outside Moore's doorway.

Although the dissent has cited case law for the proposition that Pederson acted unreasonably in reaching across the threshold of the home to arrest Moore, it is well settled that "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994). When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are critical.[4] They need not be the same, but they must be materially similar. See, e.g., Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir. 1989); see also Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989) ("The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.") (internal citations omitted). That is why we have said that "[w]hen considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar." Lassiter v.

---

[4] The conduct at issue here does not lie "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [Pederson], notwithstanding the lack of fact-specific case law" on point. See Fils, 647 F.3d at 1291. Cf. Hope v. Pelzer, 530 U.S. 730 (2002).

Alabama A&M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (citations omitted).

Qualified immunity focuses on the actual, specific details of concrete cases.

Lassiter, 28 F.3d at 1149–50.  Plaintiffs may not discharge their burden by

referring to general rules and abstract rights.  Id. at 1150.  See also Ashcroft v. al-

Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083 (2011) ("We do not require a case

directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.").  As we have discussed earlier this year:

> Furthermore, recognizing that the clearly established law question turns on
> the law at the time of the incident, the district court must consider the law
> "in light of the specific context of the case, not as a broad general
> proposition.…"  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156,
> 150 L.Ed.2d 272 (2001).  In other words, the facts of the case before the
> court must be materially similar to the facts in the precedent that clearly
> establishes the deprivation.  Marsh v. Butler, 268 F.3d 1014, 1032 (11th Cir.
> 2001) (en banc), abrogated on other grounds, Bell Atl. Corp. v. Twombly,
> 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  To be clearly
> established, the precedent must give officials clear warning of
> unconstitutional conduct.  Id.

> In considering the law to do this analysis, the district court should compare
> the facts of the case before the court that allege a constitutional deprivation
> with those cases that the party opposing the motion contends show the
> clearly established nature of the law.  As this Court has explained:

> > For qualified immunity purposes, a pre-existing
> > precedent is materially similar to the circumstances
> > facing the official when the specific circumstances facing
> > the official are enough like the facts in the precedent that
> > no reasonable, similarly situated official could believe
> > that the factual differences between the precedent and the
> > circumstances facing the official *might* make a difference
> > to the conclusion about whether the official's conduct
> > was lawful or unlawful, in the light of  the precedent.

- 42 -

> Thus, every fact need not be identical. Minor variations
> in some facts (the precedent lacks arguably significant
> fact or contains an additional arguably significant fact not
> in the circumstances now facing the official) might be
> very important and, therefore, be able to make the
> circumstances facing an official materially different than
> the pre-existing precedents, leaving the law applicable—
> in the circumstances facing the official—*not* clearly
> established when the defendant acted." Id.

Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. May 15, 2015). It is

unreasonable to expect a police officer to synthesize cases and extract from them

purely legal principles untethered to the facts with which he is confronted.[5] But

that is exactly the standard to which the dissent holds Pederson.

In my view, the two cases relied upon by the dissent on the issue of the

warrantless arrest are not sufficiently similar to this case to put Pederson on notice

that he was violating clearly established law. Thus, while those cases have drawn

lines, those lines can only be viewed in the context of the facts of each case.

Neither case is factually similar to this case and, even armed with the knowledge of

both decisions, a reasonable officer would not have been on notice that what

Pederson did violated a clearly established right.

---

[5] It should not be lost on us that the three judges on this panel have differing views of how the qualified immunity calculus should play out under these facts. If three judges, reviewing a grant of qualified immunity in the district court, have approached this question so differently, what chance did Pederson have (as he stood outside Moore's door that night) to determine that clearly established law precluded Moore's arrest?

The year before Deputy Pederson knocked on the apartment door, we decided McClish v. Nugent, 483 F.3d 1231 (11th Cir. 2007).  The deputy in McClish had previously visited with the plaintiff after receiving a complaint that the latter had made threats against a neighbor.  The deputy left the residence, returned to the station, but again travelled back to the residence for the express purpose of making an arrest.  Although, after returning to his station, he had hours to do so, he never obtained an arrest warrant.  Rather, he returned to the residence that night with the intent to arrest, not merely with the intent to investigate a disturbance.  As such there was no question that the deputy in McClish was operating under a warrantless arrest standard and *not* the Terry stop standard that is at issue in this case.  The facts of McClish are so dissimilar to this case that they could not put a reasonable officer in Pederson's position on notice that his conduct in 2008 violated clearly established law.

Nor did our decision in Bashir operate to put an officer such as Pederson on notice that reaching across the threshold of a home to effectuate an arrest during what he (erroneously) believed to be a Terry stop would subject him to personal liability for a warrantless arrest.  Bashir v. Rockdale County, Georgia, 445 F.3d 1323 (11th Cir. 2006).  The Bashir case does not address Terry stops, focusing instead on the questions of exigent circumstances and consent.  Bashir, 445 F.3d at 1328 (assuming the probable cause standard and stating "[t]he deputies must show

their presence in the home was justified, either by exigent circumstances or consent.").

Although I agree that Pederson violated Moore's constitutional rights when he reached through the doorway of Moore's home to effectuate the arrest, he is nevertheless entitled to qualified immunity. Notice is the touchstone of qualified immunity. Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003). The notice standard asks whether the right was clearly established at the time of the incident. It does not ask whether judges or legal scholars might be able to parse obscure legal principles from case law to come to the conclusion that officers were on notice of the unconstitutional nature of their actions. "We cannot realistically expect that reasonable police officers know more than reasonable judges about the law." Barts v. Joyner, 865 F.2d 1187, 1193 (11th Cir. 1989). Indeed, in fairness, we should expect law enforcement officers to know less about the law than judges. Deputy Pederson was not plainly incompetent and did not knowingly violate the law. He is entitled to qualified immunity in this case. The district court's judgment is due to be affirmed.

MARTIN, Circuit Judge, concurring in part, dissenting in part:

We have held that "a warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest and either consent to enter or exigent circumstances." Bashir v. Rockdale Cty., Ga., 445 F.3d 1323, 1328 (11th Cir. 2006). We have further specified that police may not reach through the doorway of a home to arrest someone who is standing inside. See McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007). Based on these cases, the Majority holds that Deputy Pederson violated the Fourth Amendment when he ordered Mr. Moore to turn around and put his hands behind his back and then reached through the doorway of Mr. Moore's home to handcuff and arrest him. I agree with the Majority's careful reasoning on this question and join this holding. But I part ways with the Majority on the issue of qualified immunity. I believe that the cases the Majority relies on to identify a Fourth Amendment violation clearly established it. The distinctions the Majority attempts to draw between our Circuit precedent and Mr. Moore's case are, in my view, foreclosed by our precedent or require us to find facts favorable to the officer seeking a judgment in his favor, which we are not permitted to do.

## I.

McClish draws a clear line: police may not reach through the doorway of a home to execute a warrantless arrest. Deputy Pederson crossed this line when he

reached into Mr. Moore's home to arrest him. The Majority emphasizes what it correctly calls dicta from <u>McClish</u> suggesting that this line could be blurry in circumstances where an arrestee chooses to "surrender to the police." Based on this distinction, the Majority concludes that "the law was not clearly established until today that Moore's actions in acquiescing to Pederson's instructions did not amount to consent." Maj. Op. at 33.

The Majority's reasoning does not apply the standard by which we have long defined consent. Submission to law enforcement commands is not consent, which must be free and voluntary. <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983) ("[T]he burden of proving that . . . consent was obtained and that it was freely and voluntarily given . . . is not satisfied by showing a mere submission to a claim of lawful authority."); <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1571 (11th Cir. 1993) ("The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." (quotation omitted)). This is especially true for "consent" to arrest a suspect in his home. "A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority." <u>United States v. Edmondson</u>, 791 F.2d 1512, 1515 (11th Cir. 1986).

These cases clearly establish that an arrestee does not "consent" when he obeys a police officer's command that he is under arrest.  Neither does an arrestee "surrender" anything when he obeys an officer's commands while under arrest.  Deputy Pederson told Mr. Moore he was under arrest.  He then took out handcuffs and told Mr. Moore to turn around and put his hands behind his back.  Mr. Moore did not "volunteer" or "consent" to anything when he obeyed these orders.

Not only do our consent cases clearly distinguish involuntary submission from voluntary consent, McClish specifically explained how the consent standard functions when police try to arrest a suspect at his doorway.  McClish recognized that "we have held that 'whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction entry into the home based upon inferred consent.'"  McClish, 483 F.3d at 1241 (quoting United States v. Gonzalez, 71 F.3d 819, 830 (11th Cir. 1996)).  This Circuit precedent contradicts the Majority's conclusion that the law was not "clearly established that a person in his own home who simply follows an officer's instructions from outside the home to turn around and present hands for cuffing does not 'surrender' and therefore consent to entry for the purposes of arrest."  Maj. Op. at 3.  The question of whether an arresting officer can infer implied consent to enter a home to make an arrest was not left open by McClish.  It was expressly answered in the negative.

The Majority places a lot of emphasis on the fact that the <u>McClish</u> panel cited a case from the Seventh Circuit. Too much, I think. The <u>McClish</u> panel's citation to <u>United States v Berkowitz</u>, 927 F.2d 1376 (7th Cir. 1991), was for the unremarkable proposition that "there is nothing in <u>Payton</u> that prohibits a person from surrendering to police at his doorway." <u>McClish</u>, 483 F.3d at 1241 (quoting <u>Berkowitz</u>, 927 F.2d at 1386). In making this reference, the <u>McClish</u> panel never stated the facts of <u>Berkowitz</u> or its holding, let alone any of the "alternative factual scenarios," Maj. Op. at 28, in the opinion that the Majority now analyzes for Mr. Moore's case. I cannot agree that when our Circuit makes a single general reference to an out-of-circuit case, unquoted portions of that case can change our own Circuit's more specific holding that "it is inappropriate to sanction entry into the home based upon inferred consent." <u>McClish</u>, 483 F.3d at 1241 (quotation omitted). We all agree that principles of law do not become "well established" in the Eleventh Circuit on account of holdings from other Circuits. By the same token, principles that are well established under our precedent cannot be dissipated by holdings from other Circuits.[1]

---

[1] That being said, I do not think <u>McClish</u>'s reference to "surrendering" was meaningless. This "surrendering" distinction could matter in cases where consent is not "inferred." For example, there is no "entry based upon inferred consent" if an arrestee surrenders by <u>voluntarily</u> stepping outside to submit to an arrest. I realize that the <u>Berkowitz</u> opinion discussed an officer reaching inside, not an arrestee stepping outside. But for myself, I would reach no further into another Circuit's opinion than is allowed by our own binding precedent, which forbids "entry into the home based upon inferred consent." <u>McClish</u>, 483 F.3d at 1241 (quotation omitted).

The Majority is right to point out that we must determine whether a constitutional rule is clearly established "in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). But the rule that an officer may not infer consent to reach into a home to execute an arrest is not a broad general proposition. McClish established this rule in very specific terms. It held that police could not reach into a home to make an arrest without one of three things: a warrant, exigency, or consent. See McClish, 483 F.3d at 1241. As to consent, the opinion specified that "it is inappropriate to sanction entry into the home based upon inferred consent." Id. (quotation omitted).

In both this case and McClish, police reached into a home to make an arrest. Though the McClish arrest was more forceful than Mr. Moore's arrest in that the officer in McClish grabbed the suspect before commanding him to do anything, McClish did not analyze the amount of force used by the officer. Instead, McClish held that reaching into a suspect's home to arrest him is an unlawful physical intrusion. As in McClish, Deputy Pederson here "violated [Mr. Moore]'s Fourth Amendment rights by reaching through [Mr. Moore]'s open doorway to effect the arrest when [Mr. Moore] was standing near the doorway but fully within the confines of his home." 483 F.3d at 1241.

II.

Even if a police officer could infer consent to enter a home based on a suspect obeying an order to turn around, such an implied consent only matters if we could conclude (as a matter of law) that Deputy Pederson inferred such consent in this case.  I do not think we can reach this conclusion without making factual assumptions that we are not entitled to make at the summary judgment stage.

Whether a suspect gave consent freely and voluntarily "is a question of fact to be determined by the totality of the circumstances."  United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).  "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."  Id.  In the civil context, when summary judgment turns on disputed facts or requires factual inferences, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505,  2513 (1986); see also Tolan v. Cotton, __ U.S. __, __, 134 S. Ct. 1861, 1868 (2014)  (per curiam) (summarily reversing Fourth Amendment qualified immunity decision "so that the court can determine whether, when [the nonmovant]'s evidence is properly credited and factual inferences are reasonably drawn in his favor, [the movant]'s actions violated clearly established law"); Brosseau v. Haughen, 543 U.S. 194, 197–98 , 125 S. Ct. 596, 598 n.3

(2004) (summarily reversing Fourth Amendment qualified immunity decision "to correct a clear misapprehension of the qualified immunity standard").

The Majority holds that "the law was not clearly established until today that Moore's actions in acquiescing to Pederson's instructions did not amount to consent." Maj. Op. at 33. For the reasons I have set out above, I believe our consent precedent clearly foreclosed the distinction the Majority makes here. But even if implied consent were a basis for extending qualified immunity to Deputy Pederson, this distinction is irrelevant unless we also assume the fact that Deputy Pederson could have inferred consent from Mr. Moore's reaction to his commands.

This record does not permit this finding as a matter of law. The District Court did not analyze consent. But if it had, it would have had to accept Mr. Moore's version of the facts and construe all inferences in his favor. Mr. Moore's opposition to summary judgment clearly set out his version of the facts: "Plaintiff did not consent to the interaction." Mr. Moore's deposition confirms this account specifically as to the moment Deputy Pederson reached into his home. Mr. Moore testified that he turned around and submitted to an arrest because Deputy Pederson told him to "put your hands behind your back" and then "brought the handcuffs out." In turn, he thought, "I'm sure he's got to be . . . some type of law person. So I turned around and then he put the cuffs on me. . . . The only reason I turned around is because I saw the handcuffs."

Construing the evidence in Mr. Moore's favor, as we must, there is no basis for finding "both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Hidalgo, 7 F.3d at 1571 (quotation omitted).  When it decides this case based on what an objectively reasonable officer might have inferred from Mr. Moore's conduct, the Majority neglects the requirement that  "[t]he evidence of the non-movant is to be believed" and that "all justifiable inferences . . . be drawn in his favor." Anderson, 477 U. S. at 255, 106 S. Ct. at 2513.  So even if I accepted, as the Majority does, that qualified immunity for Deputy Pederson turned on whether an officer could have objectively inferred consent, his version of the facts as the non-movant would require sending Mr. Moore's case back for a trial.

For both of these reasons, I respectfully dissent from the opinion of the Majority.